Good morning Your Honor, Tony Faramani on behalf of Mr. Rodriguez. Your Honor, this is a very simple case and what is alarming about it frankly is that no state court, no judge for that matter in federal or state court, has been able to identify a very easy violation here. And the violation being that after Mr. Rodriguez, 14 years old at the time, when he asserted his right to cancel, they never stopped interrogating him. And I'm not, you know, to be honest with you, when I first got the case, I looked to see where it is where they say they seized the interrogation. And there was never a seizing of the interrogation. And even before that, Your Honor, even before where they blatantly violated his Miranda rights, they didn't Mirandaize him at the very beginning and his statements came in. He's incriminating statements about his gang affiliation, about his gang tattoos, about a whole bunch of host of other factors that came in that the prosecutor was able to use to get a conviction here. You know, the California Court of Appeal here not only failed to recognize, or the trial court for that matter, not only failed to recognize the initial violation or the more apparent violation, if you will, but went ahead and said, well, he initiated contact. Well, that's that is absolutely false, Your Honor, as a matter of law and as a matter of fact. It is false as a matter of fact because we know the detective, the second detective that was interrogating, the older detective here, that detective testified in two separate court hearings where Mr. Rivera, the offended detective here, where he was present throughout those hearings. And he says, we initiated contact. He was very clear about it. He doesn't just say we initiated contact. He said, we asked him for, we gave him a business card and said, give us a call if you want to talk further about the case. And he says that Mr. Rodriguez at that time seemed like he was thinking about it. And he says, okay, I'll talk. So they broke him down outside. Now there's some contention as to where that happened, whether it was outside of the juvenile hall or inside of the juvenile hall. And the other detective says, no, it was the other way around. Yeah, the only factual discrepancy here, if you will, Your Honor, what came out at trial with respect to the detective who truthfully said that we initiated contact. They worked him over pretty good. They did, Your Honor. Right by the book that they used. I mean, when they said, well, when they try to convince this young man, 14 years of age, that they're really his friends, and they're going to try to help him. You know, they're going to see to it if he cooperates, that he'll be dealt with as a juvenile. Correct, Your Honor. And that they can make recommendations. I mean, they went out there, you know, playing this, whatever they were playing, his heartstrings. And I've been reading some mysteries, murder mysteries. First name is Harry, like mine. And you see the same patterns in these books that I'm reading. They're very popular. You're correct in pointing out, Your Honor, that in the transcript of the... I mean, we're your friends. We're trying to help you. You're a good boy. We're going to give you a chance. You've had a lot to offer. We're going to give you a chance. And in fact, even if we don't take into account Detective Catalito's testimony, we take Detective Rivera's word, which is, quite frankly, Your Honor, it's very difficult to do because it's not very credible at all. Yeah, but we're not the trial court. If I was a trial judge, I'd have suppressed this in a heartbeat. We're not the California Court of Appeal. If we were sitting there looking at this record, we'd say, no, there was definitely a mistake. We're on federal habeas. Yes, Your Honor. And so the facts have been found against you in some serious ways, this one included, and the one that he, you know, because the courts found that he initiated, not the other way around. And then there's this long distance between the badgering on the videotaped record where they keep going after him. Do you know this guy? Well, the person you shot was the girlfriend and all that sort of stuff. There's distance, then time before he actually confesses. So you have to deal with us where we are, not where we wish we were. In fact, Your Honor, that's precisely where I'm getting at. The U.S. Supreme Court has said, once you assert your right, you can go and re-initiate contact 14 days later. That's the benchmark, 14 days. And there's a reason for that, frankly. And here, three hours. Let's assume for a moment that what Detective Rivera at trial says, that I gave him, I gave Mr. Rodriguez my card. Because he asked for it. Because he, in case I want to talk to you. He didn't say I want to talk to you. He says, give me your card in case I want to talk to you. And he says, here's my card. We're going to turn the case over to the district attorney's office tomorrow. And he says, what am I going to get, what's going to happen? He's going to get charged with murder. Yeah. No, that's the initial. We're talking about, that's the initial, the recorded interrogation. After that, Your Honor, we're fast-forwarding. Now, keep in mind, Your Honor, those three hours, the separation between the initial and the second interrogation, those three hours he was, he remained in custody under the supervision of the same detectives. Detective initially said, at the suppression hearing, Rivera said that I didn't take him to Parker Center for fingerprinting. Then he, in fact, turned around and said, yeah, I did take him. I looked at my notes. I did take him. Let's assume for a minute they said nothing. Hard to believe, but let's assume they said nothing to him. Once they get at the Eastlake juvenile facility, they initiated contact with him. According to the second detective they initiated contact, according to Detective Rivera. Now, I understand the California Court of Appeals seemed to disagree on that. But the whole point of 2254 D-2, which is the unreasonable determination of the facts, is precisely for these kind of settings, Your Honor. And what about the fact that there was never any analysis of whether Mr. Rodriguez made a knowing and intelligent waiver of his right to counsel? Huge. Huge, Your Honor, because there's a two-pronged. We know that from Bradshaw. We know that because it wasn't enough. And what is interesting is that the trial court and the California Court of Appeals, they only analyzed the first element, which is, well, he initiated contact. Assume that to be true, even. They didn't go further and say, did he voluntarily, knowingly, intelligently waive his Miranda rights the second time around. When they didn't even re-Mirandaize him. They just took him in. So that's the second part, where if you look at the case, any angle you look at this case, Your Honor, including the fact that at least one juror during deliberations had severe doubts about the credibility of the confession. Any way you look at it, respectfully, Your Honor, we have to come to the same result. And that is, that his confession was obtained in violation of Miranda and Edwards in particular. And the factual determination, that's a legal, unreasonable application part, aspect of the AEDPA. The factual determinations were flawed. Were flawed under any way you look at it, because they didn't consider other evidence. They didn't consider Mr. Rodriguez's mental capacity. They didn't consider the fact that a precipient witness, a second detective, had said over and over again that we initiated a contact. They didn't consider Detective Rivera's. They said in the factual background, but never considered his statement that I gave him a card and said I'm going to send this over to the DA's office tomorrow. They didn't consider any of that. And they came, they just said, oh yeah, and when you look at the Court of Appeals opinion, when they're saying that they seized interrogation without any qualifications whatsoever, and then you come and look at it from, look at the same factual, you have to wonder what they were thinking. Do we have the version of the interrogation videotape that was played at trial? I wasn't sure we had it in our record here. Do you know if we do? Your Honor, the court asked for that videotape and it was sent to court. Yes, Your Honor. But was that what was used at the suppression hearing or at the trial? That was at the trial. It was admitted. And here's the interesting part of it. When the court decided to admit the videotape admissions or the interrogation, the court said, and I quote, the court takes a break, goes and talks to other judges, in fact, Judge Ito on the O.J. Simpson case and says that in fact it was part of the same interrogation. The second interrogation is part of the same interrogation, the court says that. But there's no tape of the second one, right? No, there is no tape, but when the court decides to admit the first videotape interrogation and the jury sees that. They saw the whole thing is what you're saying, not just portions. No, they saw the whole thing. I thought it was redacted. It wasn't redacted? It should have been redacted, frankly, to take out the part where they talk about his record, which was a battery on school grounds, but they didn't. They talk about the rap sheet. So the full video is what the jury saw? As far as I know, Your Honor, in fact, after the video was shown to the jury, the defense counsel objects and says, well, you know, part of it should have been redacted, Your Honor. There's talk about his priors and all that which shouldn't have been admitted. There was no legal basis for it. And the court says, well, you know, so what, pretty much, at that point. So the video, to answer your question directly, Your Honor, the video was in fact admitted as evidence, and he makes a host of admissions in that video, too. He puts himself at the crime scene, and the California Court of Appeals says, well, no, he didn't make no admissions. That's absolutely false. He puts himself at the crime scene. He puts himself with the two of the major co-defendants, Gomez and Powell, in the van. He puts himself in the van. He just, all he says is, like, I did not shoot. I was across the street when that happened. What about the pre-Miranda part, the part where he talks about the tattoos and the name? Was that introduced at trial? All of that was introduced. That's part of the same, there were two interrogations. One was at the adult police station. They call it the Northeast station. And that was the recorded part. That's the part before the crime. So they did give him a Miranda warning in that part, but they asked him questions first. I'm wondering about the part where they asked him questions before the Miranda warning. Was that part where they were asking him, that was introduced at trial, too? And that was relied upon heavily by the prosecutor in showing that he apparently got the tattoo because he murdered someone. Because in the gang culture, that's how you get a tattoo. But so there was a video of that that was actually played? Yes, Your Honor. Not only the video transcript, which was not a part of the evidence, but it was given to the jury to follow along. So they had the video and the transcript. And the initial part where he's talking about his tattoo, where he's talking about his gang affiliation, when all they knew at that time, keep in mind, Your Honor, the detectives, all they knew at that time was that Husky was the shooter. So they verify all that. Then they read him his Miranda rights in a very casual way, if you will. And the detectives were already setting up the prosecution's closing argument by arguing with him about when he got that tattoo because the murder had occurred about two months ago. And they were saying, no, that's not that old, that's fresh, that's new. You got that recently. Exactly. And the prosecutor brought that out at closing argument and relied on it very heavily to show that. And there was no evidence to support it, Your Honor, because he was arrested. The shooting happened February 23rd. He was arrested at night. He was arrested next morning for a probation violation because he went AWOL from his school. He wasn't functioning correctly. He went AWOL from school and he was cited for a probation violation and arrested. So he had basically no time. So when there was a motion for a new trial about the tattoo itself, about the prosecutor bringing it out, the judge says, well, he could have gotten it while he was in custody. People get tattoos in custody. Problem with that is there was no evidence that he ever got this tattoo in custody. There's a whole bunch of stuff going on here. But the more important thing here, Your Honor, is that every case that I've looked at from the Ninth Circuit and the Supreme Court and every angle that I've looked at this case comes to the same conclusion, and that is that not only his rights were violated, but that the California Court of Appeal, the last state court decision here, adopting some of the trial court decision, was simply flawed under any aspect of AEDPA, D1 or D2. We took you over your time, so we'll give you two minutes for rebuttal after we hear from the government. Good morning. May it please the court. Deputy Attorney General Ryan Smith for Respondent Mike McDonald. Your Honors, this case involves two distinct, excuse me, two distinct interviews separated by time, location and circumstance. Even assuming that there was a Miranda violation at the first interview,  was the petitioner's confession or statement inadmissible or involuntary? As the California Court of Appeal reasonably found, there was no causal connection between the first interview and the confession given by the petitioner at a later time. How do you distinguish Colasso? Well, first of all, Colasso was pre-AEDPA, and the California courts did not receive deference in that case. Since Colasso, and I respectfully, this case is not in my brief, but I found it in researching this issue, the case of Garvin versus Farman, it's 258 F3rd 951, and it was this court in 2001, is almost the exact same fact pattern, where in that case, the petitioner immediately requested an attorney. She was given her Miranda rights, immediately requested an attorney. They continued questioning her for 45 minutes. Later on, while the petitioner was in prison, she initiated contact with the officers and stated that she wanted to go ahead and speak to the officers and get it off her chest about what had happened, and that she had committed the murder in attempting to rob her former boss. The Ninth Circuit found, this court found that the trial, the California courts of appeal, the California courts' decision was not contrary to an unreasonable application of Supreme Court precedent. They said that there was not a causal connection between what had happened first and it happened second. So that case comes after Colasso. How much time was there in that case between the two? In that case, there was actually three days. And I know, I understand in this case, there's three hours, but like in related like Fourth Amendment cases like Siebert, you know, they're talking like five or ten minutes immediately after. I mean, this is three hours. Petitioner had time to think about what was going on. He was transferred to another facility. He was now at the Eastlake Juvenile Facility when he said he wanted to talk to the officers. You know, one of the things that's hard for me is when somebody asks for an attorney, why not give them an attorney? I mean, in this day and age with all the modern conveniences we have, it would be so easy to let him FaceTime with a lawyer for long enough to just get a little bit of legal advice. But this idea that all he did was assert his right to remain silent, and we can't question you when you assert your right to remain silent. He asked for something that the detectives just told him he was entitled to. You have the right to an attorney. And he says, great, I want an attorney. And instead, he gets driven around, they buy him lunch, they take him all over the place. He said, I don't want lunch, I want an attorney. But nobody's even commenting on the fact they never gave him access to a lawyer. Correct, Your Honor. And I mean, I don't know if it's the officer's responsibility or the detective's responsibility at that point in time to actually find him counsel. At that, when he requested- But it's their responsibility to stop questioning him and to stop threatening him, which they didn't do. Correct. I mean, Your Honors, obviously, the detectives made a mistake after he asked for counsel when they said, hey, do you know EZ? EZ's girlfriend was the one who got murdered. Correctly, there was nothing that came after that as far as a statement by the petitioner at that point in time, but you're correct, they should have stopped. But they immediately stopped right after that. They didn't continue to badger him at that point in time or imply coercive techniques to make him keep talking. At that point in time, right after that violation, they stopped and then they were processing petitioner to be arrested. They took him over to Parker to be fingerprinted. He was brought back to the station. He was treated well. He was given water, food, asked to use the restroom. He wasn't a holding, but that's the same like in the Garvin case, where she's actually in prison at that point in time, when she comes back and says she wants to speak to the officers. They go to Eastlake Facility. Yeah, I know there is a little discrepancy as far as who offered the card or whether a petitioner asked for the card. But there's no Supreme Court precedent that says offering a business card is a re-initiation of contact. To make a bright line rule that, okay, an officer can never say, hey, do you want to talk later, that's re-initiating contact, would cause an unreasonable expansion of Miranda and what Miranda was roped for. What about the fact that no court ever found that he made a knowing, voluntary, intelligent waiver of his right to counsel, only that he initiated on his own? That's the only finding we have. We're talking about a 14-year-old kid here, too, who was born in Mexico. Yes, your honor, I mean, his age obviously does play a factor into the totality of the circumstances. But immediately when petitioner stated that he wanted to speak to them after the card was exchanged, the detective Rivera told him, you indicated to us that you did not, didn't want to speak to us because you wanted to speak to an attorney. You should speak to an attorney, and then after the fact, if you still want to talk to us, please talk to us. At that point in time, petitioner said, no, I want to speak with you. And this is the factual findings that the trial court made, believing Detective Rivera's testimony at that point in time. Well, this was after they made a lot of indications to him that they thought he was a good kid, that they wanted to help him, and that he would be treated as a juvenile. They went through this whole process of trying to get him to feel as if they were the people that could help him out. That's what they did. Yes, your honor, they did say certain things. You're telling me this is an unnecessary expansion of Miranda. You know, Miranda has not been respected almost from the day it was decided. And I can tell you this, from my own experience, if used properly, Miranda is a very good law enforcement mechanism. Yes, your honor. I'll just take another second and tell you this, that I was on the municipal court bench in San Fernando when Miranda came down. And the police at Foothill, Van Nuys, they were having a lot of trouble with it. Then I found that there was a guy in Reno selling these Miranda warnings with the waiver in the back for $0.10 apiece. So I sent him $10. I got a whole bunch of them. And every time they would foul up the police, I'd give them one. I passed out a lot of them. And I was amazed to get some feedback from them telling me how much it helped them when they gave those Miranda warnings. It gave the defendant the feeling that I'm dealing with someone who is telling me what my rights are. And we had a detective knock on the door of a home. And the woman came to the door. And he asked her if she could come in, because he knew there was a lot of stolen art in that house. And she said, do you have a search warrant? He said, no. Well, you can't come in. Then he said, before I go, may I just read something to you? And she said, OK. So he read her Miranda rights. Next thing she did was, oh, come on in. There it was. I can give you about a half a dozen more stories like that. I'm sure you do, Your Honor. It hasn't been respected from the get-go. Everyone's trying to cut it back. I was in high school when Miranda was decided. And now I want Judge Friedland to tell us where she was. Would you repeat that? He asked you to repeat that. I said, I was in high school when Miranda was decided. And now I want Judge Friedland to tell us where she was in 1966. I'm going to plead the fifth. But I have a question about this Garvin case that wasn't in your briefs, but it seems like you're relying on now. It looks like in Garvin, there was a re-Mirandizing before the second questioning phase. And it also looks like our court, and it seems like the state court from my quick read, relied on the fact that this was a sophisticated defendant. Seems like both of those things are not true in this case and are pretty key differences, aren't they? Well, respectfully, Your Honor, no. The defendant, the petitioner in this case, although he's 14 years old, I mean, I don't know if you actually watched the video. He's calm. He's able to communicate effectively with the detectives. He was able to understand. He has the academic level of a fifth grader? Yes, Your Honor. And an IQ of 75 or 6 or something like that. Yeah, don't. These detectives are pros. I mean, I was a prosecutor for 12 years. I know the homicide detectives. They're great at what they do. And this is a double team right out of the textbook, like Judge Perguson said. And there's nothing wrong with that, as long as you abide by the restrictions that are there under Miranda and Edwards. And so we're not criticizing them. We're saying they did their job great. But did they comply with the legal protections here? Well, Craig, I understand your concerns, Your Honors. And I agree he's 14 years old. But the point I was trying to make was that he did understand that he did not have to speak, that he could talk to an attorney. And he invoked that right. He later, after being told, again, that, hey, I want to talk to you, when the detectives told him, you already said you didn't want to talk to us. We can't talk to you until you speak with an attorney. Speak with one first, and then come back. And if you still want to talk to us, we'll talk to you. But he decided to do so. How is he supposed to speak to an attorney when no one is giving him an attorney? It's not like you said, I got an attorney in the other room. Go talk to him. And then if you want to talk to us, talk to us. The kid says, I want to talk to a lawyer. Hours later, after two trips to other locations, no one's provided him with a lawyer. And he sees my last best opportunity to avoid adult prison might be going by the wayside here. I better do something. But nobody gave him an opportunity to talk to a lawyer. Respectfully, Your Honor, I'm not sure the exact policy on when they would provide him with a public defender, or who, and how that process actually plays out. And I'm not for sure if the detectives knew at that point in time. Who authored Miranda? I'm sorry, Your Honor. I could not tell you that off the top of my head. Earl Warren? I thought it was. Very well could be, yes. Judge Friedland will tell us in no time. We'll tell you in a second. In a second, yes. I'm an attorney general in the state of California. Pardon me, Your Honor? What? Pardon me, I didn't hear you. Chief Justice Warren. I'm sorry, I didn't hear what you had said, Judge Bragerson. What did he say? He didn't understand your question. But it was Warren. Oh, he didn't. All right, well, I won't hold that against you. OK. Unless there's any further questions at this point. I just asked you who the author of Miranda was. And Your Honor said Judge Warren, correct? Chief Justice Warren. Chief Justice Warren. Chief Justice Warren, yes. Former attorney general of your office. Correct, and that's what you had said. I did not hear what you had said, yes, Your Honor. And I knew him well. I was going to say, I bet Judge Bragerson has some great Earl Warren stories. Yes, Your Honor. And you know what his guide was on every case? Know what it was? No, I do not. No, I don't know, Your Honor. Fair. Was it fair? It's a good credo, Your Honor. It's a great guide for prosecutors to remind themselves of. And we're not being critical of you, counsel, totally. But it's not a question of, can I do this? Sometimes it's a question of, should I do this? It was from Bakersfield, where I think it grew up in Taft. His father worked on the railroad. His daughter is still here. Honeybear. Honeybear. Thank you, counsel. That's the court housing for the question. Thank you very much. Thank you, Your Honor. We'll give you two minutes for rebuttal. Yeah. Do you have a nickname at all, Mr. Fermante? I do not. I do not. OK. Your Honor, I failed to let you know where the trial judge found, as a matter of fact, that the two interrogations were continual. And the trial judge says this. When he decides, the judge, when he decides to admit the videotape interview on ER 682 and ER 735, he says, the court concluded that the initial conversation to be part of the later conversation and he says, the court felt that the second interview was merely a continuation of the first interview. Now, what does that tell us? That tells us, regardless of what went on about initiation and all that other stuff that muddies the water here, it was the same interview. His rights were violated. Three hours later, he's with the same people, unlike the case that Mr. Smith decided to the court, as Your Honor pointed out. He was a juvenile. The defendant in the other case had an opportunity. The brain of a boy like that isn't developed until he's about 28 years old. Absolutely, Your Honor. To violate his. 10 years behind the girls. That's right. And to violate, to violate. And I, you know, frankly, we're not just talking about a 14-year-old when I was growing up. We're talking about a 14-year-old in recent times, where they're far different than what they were before. They're less sophisticated. Well, because we have, we have, you know, when I grew up in East L.A., marijuana was legal. People were taking lawn, you know. And my whole time growing up there, I never saw anybody smoking or smelled it, or even knew what it smelled like. Until I got on the Superior Court, and I had this great prosecutor, and he asked me, have you ever seen a roach? And I said, I don't think so. So he came up on the bench there, and he had a little tweezer, and he had that little piece of paper with some leaves in it. They grew the stuff. Somebody better advise Judge Perguson of his Miranda rights, though. And that's precisely what should have happened, Your Honor, at the beginning of the interview here. Mr. Fermani. Yes, Your Honor. Once you make it illegal. Yeah. Have you met with Mr. Fermani? It's the Bible, you know. Forbidden fruit. Right. That's right. Not illegal anymore, Your Honor. Mark Twain has got a whole chapter on that. Have you met with Mr. Rodriguez? Although I have not met Mr. Rodriguez face-to-face, Your Honor, I've had this case for quite some time, because it took some time to get the records, and I've communicated with him many times. He's communicated to my kids. He's communicated with me many times. Will you stay on the case if it goes forward? Absolutely, Your Honor. All right. Thank you. Thank you, both sides, for your helpful arguments. The case is submitted.
judges: Pregerson, Friedland, Lasnik